**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**POWER TOOLS & SUPPLY, INC.,**

                **Plaintiff(s),**        **CASE NUMBER:  05-73615**
                                          **HONORABLE VICTORIA A. ROBERTS**

**v.**

**COOPER POWER TOOLS, INC.,**

                **Defendant(s).**
_____/

**ORDER**

## I.     INTRODUCTION

This matter is before the Court on three Motions for Summary Judgment:  1)
Defendant's Motion for Summary Judgment on Plaintiff's Fourth Amended Complaint; 2)
Defendant's Motion for Summary Judgment on Cooper's Counterclaim; and 3)
Defendant's Motion for Summary Judgment on Plaintiff's Counterclaim in Reply.  The
Court **GRANTS** all of Defendant's motions.

## II.    BACKGROUND

This action arises from distributorship contracts between Plaintiff Power Tools &
Supply, Inc. ("PTS") and Defendant Cooper Power Tools, Inc. ("Cooper").  Cooper
manufactures, markets and distributes industrial power tools throughout the United
States and Europe.  PTS is a Michigan distributor for Cooper and a number of other
companies.

In June 1999, PTS and Cooper entered into a Domestic Distributor Agreement

("the Distributor Agreement") which allowed PTS to act as the non-exclusive distributor for certain of Cooper's products in Detroit, Flint, and Saginaw. In July 1999, the parties also entered into the APEX Distributor Agreement ("the APEX Agreement"), which allowed PTS to act as a non-exclusive distributor in the Eastern Michigan region. Both Agreements prohibit PTS from distributing Cooper products outside its designated territories. In March 2004, the parties executed a Super "D" Addendum to the Distributor Agreement ("the Super 'D' Agreement") which entitled PTS to certain rebates and added additional PTS obligations but did not otherwise modify the terms of the Distributor Agreement.

PTS' claims revolve around one customer--DaimlerChrysler ("DCX"). DCX utilizes Cooper power tools and purchased them from various Cooper distributors, including PTS, at least as far back as 2000. In April 2003, Cooper entered into a Blanket Purchase Order with DCX under which Cooper sold tools to DCX at discounts of at least 14% below the list price. Cooper divided the contract amongst its distributors by assignment; distributors were only allowed to sell products to the DCX plant to which they were assigned by Cooper. The distributors were then responsible for shipping the proper materials to the designated plants at the correct price.

Before Cooper obtained the Blanket Purchase Order, PTS says a Cooper representative, Bill Douglas, made an oral promise to PTS President Jeffrey McClure that PTS would be the exclusive distributor for DCX in Michigan. Douglas allegedly made the promise once in 2000 and again in 2001 or 2002 after another distributor's contract (Kramer Air and Supply, Inc.) with Cooper was terminated. Per McClure, Douglas said PTS "would always have the opportunity to sell Cooper tools to

DaimlerChrysler if [PTS] expended the time, effort and money to build up sales of Cooper tools to DaimlerChrysler," and that PTS was "going to be [Cooper's] supplier from here on out" and "handle all of DaimlerChrysler." Pl. Exh. CC at p. 28,84. PTS contends Douglas made the promise in exchange for PTS' willingness to perform various services for Cooper which were not required under the Distributorship Agreement (such as promoting Cooper tools at plants outside PTS' region) and because PTS invested in computer equipment necessary to receive DCX orders electronically. In March 2003, PTS says Cooper assigned it all of the Michigan DCX plants "in performance of [Douglas'] promise." Pl. br. at p. 3.

The initial termination date of Cooper's Blanket Purchase Order was March 31, 2005. But, it was extended to June 30, 2005. On April 16, 2005, DCX's purchasing agent, A.T. Kearney, Inc. ("ATK"), solicited bids through a Request for Proposal ("RFP") for a single supplier (as opposed to multiple distributors) to provide DCX with all of its power tools needs in North America, regardless of the manufacturer of the power tool or location of the DCX facility. One of DCX's primary objectives was to lower costs. To that end, ATK compiled a list of every power tool or related part DCX purchased and requested that bidders provide a substantial cost savings on each item.

In apparent anticipation that some of its distributors would be interested in submitting a national bid, Cooper essentially advised distributors that it intended to enforce the territorial limitations in the distributorship agreements by reiterating that Super "D" discounts on Cooper tools would only apply to the distributors' assigned territories, not nationwide. But, Cooper told distributors that it would submit a bid for the national contract, and, if successful, it would continue to assign responsibility for DCX

plants to the network of distributors. PTS points out that Daniel Sheehan, Cooper's

Regional Sales Manager, specifically said Cooper would submit a national bid in order

to protect distributors' respective territories:

> The discussion was to let them know that we were working on this
> because we wanted our distribution base to know that we were -- we
> were actually protecting them with their local territories . . . and we
> wanted to prevent chaos from one distributor trying to quote the
> entire package, which couldn't happen because they would be
> violating their distributor agreement by selling out of their territory, so
> there's no one distributor that could service everything. So we
> wanted to assure our distributors that we were working to secure the
> contract with A.T. Kearney, DaimlerChrysler and we were going to
> protect their territory, their local plants.

Pl. Exh. CD at pp. 8-9.

Eighteen manufacturers and distributors, including PTS and Cooper, submitted

line-item bids. Cooper submitted a national bid on May 4, 2005. On May 9, 2005, PTS

submitted a bid within its region. Cooper submitted a revised bid on May 16, 2005

purportedly to offer additional savings. But, PTS points out that, although the prices

DCX paid under the Blanket Purchase Order were 14 percent below the list price,

Cooper's first bid was 6.95 percent *above* the list price and the revised bid was only

reduced to the list price, which was still a 14% increase over what DCX was then

paying. According to ATK's analysis, Cooper's bids offered the least percentage of

savings (-24.75 and -19.74 percent). Pl. Exh. BV. PTS' bid also offered a negative

percentage of savings (-0.07 percent). *Id.* Only six of the eighteen bids submitted

offered any savings (between 0.08 and 5.24 percent). *Id.*

After ATK declined to accept any of the bids submitted, one of Cooper's former

distributors, Kramer Air and Supply, Inc. ("Kramer"), executed a different strategy.

Rather than submitting a line-item bid for each tool, Kramer proposed a fixed price for the entire contract. Kramer's proposal was successful. On June 27, 2005, ATK awarded the DCX contract to Kramer, effective June 30, 2005, the day Cooper's Blanket Purchase Order ended.

During the bidding process, Cooper and Kramer finalized settlement terms for litigation in which they had been embroiled for several years. Kramer was a Super "D" distributor for Cooper in Michigan until Cooper terminated the contract in December 2000. Kramer filed suit to protest the termination in August 2001. Settlement negotiations began in earnest in January 2004. During those negotiations the parties first explored the possibility of Kramer resuming a relationship with Cooper which would allow Kramer to purchase Cooper products at a discount. After fifteen months of negotiation, Kramer and Cooper signed a confidential settlement agreement on May 12, 2005 which, *inter alia*, reinstated Kramer as a non-exclusive distributor, but on different terms than PTS. Kramer's distributorship contract was referred to as an "Integrator Agreement," under which Kramer was only permitted to purchase Cooper products for sale to a third-party which whom it had a "Managed Contract," defined as a contract with a plant, facility or parts department where Kramer supplies substantially all of the power tools and parts. Def. Exh. 2. But, Kramer received a discount equivalent to that provided under PTS' Super "D" agreement, and there was no geographic restriction. *Id.*

PTS says it lost business on two fronts after the Cooper-Kramer settlement and DCX's award to Kramer. After Cooper terminated Kramer's distributorship contract in 2000, PTS began selling Cooper products to Kramer. PTS says it did so at Cooper's request, which request allegedly was made for tactical litigation and business reasons.

In 2001 and 2002, PTS sold over $1 million dollars worth of products to Kramer and nominal amounts in 2003 ($2,695.50) and 2004 ($80.49).  PTS also provided tool repair services to Kramer in 2001, 2003, and 2005.  After the settlement agreement, however, Kramer began to purchase Cooper products directly from Cooper for a period of time (until a dispute arose regarding whether the DCX contract constituted a Managed Contract).  PTS contends Cooper's sales directly to Kramer violated its Distributorship Agreement with PTS, because PTS contends the contract required Cooper to direct sales inquiries from Kramer to PTS--inasmuch as PTS apparently regards Kramer as a third-party customer.

PTS was also unable to sell Cooper products to DCX after the contract was awarded to Kramer.  PTS attributes this loss of business to Cooper's response to ATK's bid solicitation, and its failure to advise PTS of the terms of the Kramer settlement agreement.  That is, PTS alleges that Cooper prohibited distributors from bidding on the DCX contract, submitted bids it knew were not competitive, and failed to advise PTS of the terms of the settlement agreement before bidding closed (which prevented PTS from submitting a more competitive bid since PTS contends the settlement set the stage for Kramer to win the bid).  PTS asserts that Cooper's behavior amounts to illegal "bid rigging;" Cooper's actions were intended to pave the way for Kramer's ultimately successful proposal.  Cooper denies it engaged in sabotage for any purpose and contends it was not obligated to apprise PTS of the terms of the settlement agreement.

In August 2005, PTS filed this action.  In a Fourth Amended Complaint, PTS alleges:  Count I--breach of contract; Count II--fraud; Count III--negligent representation; Count IV--silent fraud; Count V--wrongful interference with economic expectancy; Count

VI--unjust enrichment; Count VII--breach of fiduciary duty; and, Count VIII--promissory estoppel.

The parties maintained their contractual relationship for a brief period after PTS filed suit. However, the Distributor and APEX Agreements included termination provisions which permitted either party to terminate without cause with 30 days and 6 months notice, respectively. On May 2, 2006, Cooper sent written notice to PTS terminating the Distributor contract in 60 days and the APEX contract in 6 months. Cooper's Business Unit President for PTS, Robert W. Davies, says Cooper elected to terminate the contracts for several reasons:

1. PTS actively promoted a competitor's product line;
2. PTS hired one of Cooper's best salesman to start a new distributorship in Texas as the exclusive distributor for Bosch;
3. PTS was difficult to do business with and was not sufficiently promoting Cooper products.
4. There was a complete breakdown in trust with the ownership of PTS based in part on their filing a lawsuit against Cooper;
5. PTS wasted Cooper's assets by forcing it to defend itself against baseless claims.

Def. Exh. 15, Davies Declaration.

In October 2006, Cooper filed a Counterclaim alleging several state law claims, based on PTS' alleged failure to pay for goods it received. Cooper alleges: Count I--breach of contract; Count II--account stated; and, Count III--unjust enrichment. PTS filed an Answer and Affirmative Defenses to Cooper's Counterclaim, and its own Counterclaim and Demand for Jury Trial ("Counterclaim in Reply"). In the Counterclaim in Reply, PTS alleges that Cooper's termination of the distributorship contracts and alleged solicitation of PTS employees constitute: Count I-- breach of contract; Count II-- violation of the South Carolina Unfair Trade Practice Act ("SCUPTA"), S.C. Code §39-5-

10, *et seq.*; and, Count III--breach of fiduciary duty. However, the Court granted Cooper's motion to dismiss the SCUPTA claim in an earlier Order. *See* Order, June 26, 2007. So, only PTS' breach of contract and breach of fiduciary duty claims remain.

In three separate motions, Cooper requests summary judgment on: 1) PTS' claims in the Fourth Amended Complaint; 2) PTS' Counterclaims; and 3) Count I of Cooper's Counterclaim (which Cooper says would render the remaining Counts moot).

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing

out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV. APPLICABLE LAW AND ANALYSIS

### A. Motion for Summary Judgment on Fourth Amended Complaint

#### i. Breach of Contract

In its Fourth Amended Complaint, PTS alleges multiple breaches of the Distributor and Super "D" Agreements. PTS says Cooper breached both Agreements by: 1) not permitting PTS to bid on the DCX contract as a single supplier of Cooper tools; 2) failing to direct sales inquiries to PTS; 3) failing to act in good faith toward PTS by interfering with or destroying PTS' right to enjoy the fruits of the contracts; 4) treating

9

other distributors in a more favorable manner; 5) not disclosing to PTS that Kramer would be permitted to become a single nationwide supplier to DCX and buy Cooper tools at a discount; 6) allowing Kramer to become the single supplier to DCX, thus impermissibly removing DCX as a customer to whom PTS could sell Cooper products; 7) refusing to accept inventory returns as required under the contract; and 8) failing, pursuant to an express or implied unilateral contract, to pay PTS a 5% rebate on all Cooper power tools sold by Kramer to DCX and General Motors if PTS maintained or grew business levels for those accounts (presumably after Kramer was terminated as a distributor), and preventing PTS from performing the unilateral contract after July 2005 by allowing Kramer to be the sole supplier for DCX. *See* Fourth Amended Complaint at ¶¶38,40,41,43,45,46,48. PTS' claim regarding the 5% rebate allegedly owed was dismissed by stipulation in June 2007. *See* Stipulated Order of Dismissal of Claims Related to Unilateral Contract Only, June 1, 2007. Cooper argues that each of PTS' remaining claims lacks either a factual or legal basis. The Court finds that PTS failed to establish a question of fact with respect to any of its claims.

### a. Direct Sales to Kramer

The parties agree that South Carolina law applies to PTS' breach of contract claims, pursuant to a choice of law provision in the Distributor Agreement.

After Kramer was awarded the DCX contract, PTS alleges that Cooper violated the Distributor Agreement by directly selling its products to Kramer, which in turn sold them to DCX. PTS bases its argument on the claim that Cooper (via Douglas) made an oral promise that PTS would be the exclusive Michigan distributor for DCX, and two provisions of the Distributor Agreement: 1) the requirement that Cooper "direct sales

10

inquiries received by [Cooper] to the Distributor which can best service the customer's needs, as determined by [Cooper]," and 2) Cooper's reservation of the right to quote and sell products directly to only five categories of customers, referred to as "Reserved Accounts." Def. Exh. 1 at ¶¶V, VI(F). Reserved Accounts include:

A.   All local, state, and federal government agencies.

B.   All non-industrial accounts such as contractors, automotive jobbers, and name-brand customers.

C.   Original Equipment Manufacturers (OEM's) defined as those manufacturers incorporating [Cooper's] products physically in or with another product which is to be marketed generally and publicly.

D.   Foreign accounts (those outside the United States) and [] domestic accounts which purchase products for use in foreign markets.

E.   National Accounts not normally serviced by Distributors or those having annual purchase contracts with [Cooper].

Def. Exh. 1 at ¶V. Because Kramer does not fall into one of these categories, PTS argues that Cooper was obligated to direct Kramer's purchase orders to PTS.

PTS' reasoning is flawed and lacks evidentiary support. The alleged oral promise of exclusivity on which PTS' claim hinges could only be fulfilled by Cooper when it was in a position to designate or direct DCX sales to PTS. It is undisputed, however, that Cooper's Blanket Purchase Order with DCX ended when DCX awarded the contract to Kramer. There is no evidence Cooper had any authority after that time to direct DCX sales to PTS.

There is no merit to PTS' assertion that, after Kramer was awarded the DCX contract, Cooper should have funneled Kramer's purchase orders on behalf of DCX

through PTS, in accordance with its obligation to direct sales inquiries to a distributor, because PTS acknowledges that Kramer was also a Cooper distributor, not a customer. PTS does not identify any provision in the Distributor Agreement which required Cooper to forward purchase orders from one distributor to another, or which prohibited Cooper from reinstating Kramer as a distributor via the settlement agreement or otherwise. PTS failed to establish that Cooper's direct sales to Kramer violated any provision of the Distributor Agreement.

### b. Illegal Bid Rigging and Inducement to Prevent PTS from Bidding on DCX Contract

PTS alleges that Cooper: 1) did not permit it (PTS) to submit a national bid on the DCX contract; 2) failed to act in good faith towards PTS by interfering or destroying PTS' right to enjoy the fruits of the contracts; 3) treated other distributors in a more favorable manner; and 4) allowed Kramer to become the single supplier to DCX, thus impermissibly removing DCX as PTS customer. Each of these claims is based on the same premise--that Cooper breached the terms of the Distributor agreement by manipulating the bidding process to ensure Kramer's success (bid rigging), which included inducing PTS not to bid on the entire DCX contract. However, PTS does not present evidence either of bid rigging or that Cooper asked or induced PTS not to bid on the entire contract.

PTS admits in its brief that Cooper did not prohibit it from submitting a bid. Pl. br. at p. 34. McClure also testified he could not recall any Cooper representative telling PTS that it could not submit a bid for the entire DCX contract. Def. Exh. 24 at pp. 62-64. Instead, McClure testified that PTS made a "business decision" to limit its bid to

Michigan for the other product lines it had a distributorship agreements with (besides Cooper) because he thought it prudent not to disrupt the networks in place. Def. Exh. 24 at pp. 40-41. He said his "business intuition was not to alienate or disrupt that situation." *Id* at 41. McClure later indicated he made the same business decision with respect to PTS' bid for the Cooper line. *Id* at 50-51.

Nevertheless, PTS maintains that Cooper "wrongfully" induced it not to submit a bid via Sheehan's assurance that Cooper would submit a national bid and "protect" the distributors' territories, and Sheehan's alleged explicit assertion to McClure that Cooper did not want PTS to handle any area other than Michigan. PTS does not establish how either comment constitutes "wrongful" inducement. Cooper did submit a national bid. In accordance with its claim of bid rigging, PTS questions the extent to which Cooper made a good faith effort to secure the bid since Cooper's bids offered no savings and were mathematically the worst of those submitted. PTS also theorizes that Cooper failed to submit a more competitive bid because of its desire to assist Kramer in securing the contract. But, there is no evidence that Cooper deliberately sabotaged its own chance of success. And, there is no evidence Cooper was even aware when it submitted its bids that Kramer intended to do so as well. In fact, Kramer's Operations and Finance Officer Matt Kramer, testified he did not advise anyone at Cooper that he intended to submit a bid on the DCX contract before Kramer and Cooper executed their settlement agreement on May 12, 2005, and that ATK's solicitation of bids was never discussed during settlement negotiations. Def. Exh. 19 at pp. 32-33. Matt Kramer's testimony is unrefuted, there is no evidence Cooper was otherwise aware of Kramer's bid, and Cooper submitted its own initial bid to ATK eight days before the settlement

agreement was signed.

PTS argues that Cooper discouraged it from bidding on an area outside Michigan.  However, PTS acknowledges there were territorial limitations in its contracts and it does not dispute that those provisions were valid and enforceable.  Also, PTS could have submitted a national bid despite the territorial limitations; but, its Super "D" discounts would not apply to products purchased from Cooper for sale outside those limitations.  PTS failed to establish breach of contract on these grounds.

### c.  Failure to Disclose Settlement Negotiations and Agreement

PTS' assertion--that Cooper breached their contracts by "not disclosing to PTS that Kramer would be permitted to become a single nationwide supplier to DCX and buy Cooper tools at a discount"-- presumably pertains to Cooper's failure to inform PTS of its contract negotiations with Kramer.  PTS, however, failed to cite any provision of its contract or other authority which imposed a duty upon Cooper to keep PTS apprised of the settlement negotiations.  To the extent PTS claims a duty arose because Cooper was aware of the negative impact the settlement would have on PTS' sales to DCX and Kramer, there is no merit to the claim.  There is no evidence Cooper was aware during the negotiations that Kramer would be awarded the DCX contract (or even that it submitted a bid).  And, PTS failed to identify any provision of its Distributorship Agreement which prohibited Cooper from entering into a distributorship contract with Kramer or required it to notify PTS of its intention to do so.

### d.  Inventory

PTS alleges Cooper refused to accept inventory returns as required under the

14

contracts. There is no evidence to support the claim.

The relevant provisions of the return process set forth in the Distributor

Agreement require a distributor to obtain written approval from Cooper and that, *inter*

*alia*, returned items be new and current:

    a.    Written approval from Cooper must be obtained before
returning products for credit. Goods returned for credit should
be sent by prepaid transportation.

    b.    Distributor's Annual Inventory Adjustment - Slow moving stock
of Cooper manufactured products may be returned with
Cooper's prior written approval provided:

        1.    The products are in new and unused condition and
salable without repair or work.
        2.    The products are of current design.
        3.    Cooper determines that they can readily sell the goods
to another user.
        4.    The return is accompanied by a new purchase order of
100% or greater dollar value for Cooper products.

Def. Exh. 1, Domestic Terms and Conditions of Sale, ¶6(a)-(b). Upon termination of the

contract by Cooper, a distributor was given 30 days to "return current, new and salable

inventory purchased from [Cooper] at the net prices paid by the Distributor." Def. Exh. 1

at ¶VIII(C)(2). Cooper reserved absolute discretion to discontinue any product or model

or to add new products to its line. *Id* at ¶IV(J).

In January 2000, Cooper revised the return policy to limit the return amount to 10

percent of the distributor's previous year's purchases, returns were only accepted once

per calendar year, and discontinued, obsolete, or special items, as designated in

Cooper's price lists or notices, were excluded. Def. Exh. 46. In March 2003, Cooper

modified the policy again by, among other things, increasing the number of returns

allowed to one per quarter in the first three quarters of the year and the return amount to

15

5 percent each quarter for the first three quarters.  Def. Exh. 47.  Cooper also stated

that one condition of return was that: "All products must be of current design.

Discontinued, obsolete or special items and/or expendable parts . . . are excluded from

the Inventory Adjustment Policy."  *Id.*  Andrew Vlaeminck, who was in charge of

inventory control and management for PTS, acknowledged he understood "current

design" to mean that the items had to be on Cooper's current price list and that any item

designated as special or non-returnable would not be accepted under the return policy.

Def. Exh. 25 at pp. 7, 91.

After PTS' contracts were terminated, Cooper extended two explicit invitations for

PTS to return items in accord with the post-termination provisions of their contracts.

PTS declined both invitations because Cooper would not agree to accept a return of all

inventory previously rejected.  Def. Exhs. 52, 53, 54.  So, PTS' claim is based solely on

Cooper's failure to accept returns under the terms in effect prior to Cooper's termination

of the contract.

PTS compiled an extensive list of items which were rejected (apparently between

2001 and 2005) because Cooper deemed them to be either "special," "discontinued," or

"non-returnable."  Def. Exh. 45.  PTS does not dispute Cooper's entitlement under the

terms of the contract to make such a designation or that tools so designated were not

returnable.  Instead, PTS directs the Court's attention to a Product Discontinuation

notice Cooper sent to distributors in October 2003.  Pl. Exh. CJ.  In the notice, Cooper

advised that Gardner-Denver Instrumented Pulse Tools would be discontinued, but

further stated that "CooperTools will continue to support Gardner-Denver instrumented

pulse tools and supply spare parts per our discontinuation policy."  *Id.*  In a November

2003 memo, Cooper listed the affected items and indicated it would only accept returns during the month of January in 2004.

PTS states that the inventory at issue is composed mostly of spare parts, and the October notice misleadingly suggested that Cooper would continue to support spare parts. Yet, PTS says Cooper rejected spare parts it attempted to return because they were deemed "obsolete." PTS challenges the designation stating that "[i]f Cooper was still selling spare parts, then it should have received the parts back via an inventory return because the parts were not 'obsolete.'" Pl. br. at p. 31.

There is no evidence to support breach of contract on this ground. PTS failed to identify which, if any, of the items affected by the October 2003 notice are included in the list it compiled, or to otherwise present evidence that Cooper, in fact, rejected PTS' attempt to return those items as obsolete. And, PTS failed to demonstrate how its disagreement with the manner in which Cooper determined which items to designate as "obsolete" constitutes a breach of the Distribution Agreement, inasmuch as the Agreement effectively allows Cooper to unilaterally make such a designation by giving Cooper absolute discretion to discontinue any product or model.

For the reasons stated, the Court grants Defendant's motion on all breach of contract claims (Count I).

### ii. Tort Claims

As a preliminary matter, the parties agree that Michigan state law governs PTS' tort claims in Counts II through V. PTS did not respond to Cooper's request for summary judgment on its claim of negligent misrepresentation in Count III. That claim is presumed waived.

17

Cooper contends PTS' remaining tort claims are barred by Michigan's economic loss doctrine because they are all based in contract.  Cooper invokes the correct principle but the wrong doctrine.  As PTS states, the economic loss doctrine does not apply because it pertains to claims arising from the sale of defective goods and limits a litigant's remedies to contract, not tort.  *See Sherman v Sea Ray Boats, Inc.*, 251 Mich. App. 41, 43-44 (2002).  No such claims are asserted in this case.

But, Michigan also precludes a litigant from proceeding with a tort action for nonperformance of a contract.  *Casey v Auto Owners Ins. Co.*, 273 Mich. App. 388, 401 (2006); *Nelson v Northwestern Savings and Loan Ass'n*, 146 Mich. App. 505, 509 (1985).  "[T]here must be a breach of a duty separate and distinct from the duties imposed by the contract."  *Nelson*, 146 Mich. App. at 509.  "It has often been stated that the sometimes hazy distinction between contract and tort actions is made by applying the following rule: if a relation exists that would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise it will not."  *Sherman*, 251 Mich. App. at 49.

Each of PTS' tort claims is indisputably rooted in the obligation PTS contends Cooper had under the Distributor Agreement and Super "D" Addendum--to make a legitimate effort to secure the DCX contract to protect PTS' distributorship interest. Therefore, Defendant's motion for summary judgment is granted on Counts II through V on that ground alone.  As set forth below, however, PTS' tort claims also fail on the merits.

### a.    Fraudulent Misrepresentation

PTS argues that Cooper made a fraudulent misstatement which PTS relied upon

to its detriment; namely, that Cooper would submit a competitive national bid for the DCX contract. In fact, PTS contends Cooper submitted bids it knew would not be competitive, but misled PTS about its intentions in order to induce PTS not to submit a competitive national bid and to, effectively, clear the way for Kramer's proposal.

Fraudulent misrepresentation requires that a plaintiff prove:

> (1) The defendant made a material representation. (2) The representation was false. (3) When the defendant made the representation, it knew that it was false, or the defendant made it recklessly, without knowledge of its truth, and as a positive assertion. (4) The defendant made the representation with the intention that it should be acted on by the plaintiff. (5) The plaintiff acted in reliance on the representation. (6) The plaintiff suffered injury due to his reliance on the representation.

*The Mable Cleary Trust v The Edward Marlah Muzyl Trust*, 262 Mich. App. 485, 500 (2004). For reasons already stated, PTS failed to show that Cooper falsely represented its intentions with respect to its DCX bids; there is no evidence Cooper deliberately submitted bids it knew DCX would reject. Defendant's motion on Count II is granted.

### b.    Silent Fraud

To prove silent fraud, plaintiff must show that the defendant suppressed or failed to disclose a material fact that the defendant was under a duty to disclose. *M&D, Inc. v W.B. McConkey,* 231 Mich. App. 22, 29 (1998). PTS does not identify any fact Cooper had a duty to disclose but did not. PTS only asserts that: 1) Cooper should have expected that Kramer would bid on the DCX contract (contrary to Cooper's claim that it was unaware of Kramer's intentions) because the settlement agreement allowed Kramer to resume its role as a distributor; 2) Cooper knew Kramer would be the only company in Michigan which could service DCX if PTS did not bid and it engaged in bid

rigging to ensure Kramer would be chosen; and 3) in Michigan, businesses have an

obligation to disclose after-acquired information.

No evidence supports the factual basis of the first two assertions, and PTS does

not even identify the alleged after-acquired evidence it claims was withheld.

Defendant's motion for summary judgment on Count IV is granted.

### c. Tortious Interference with Economic Expectancy

The elements of tortious interference with a business relationship or expectancy

are:

> (1) the existence of a valid business relationship or expectancy that
> is not necessarily predicated on an enforceable contract, (2)
> knowledge of the relationship or expectancy on the part of the
> defendant interferer, (3) an intentional interference by the defendant
> inducing or causing a breach or termination of the relationship or
> expectancy, and (4) resulting damage to the party whose relationship
> or expectancy was disrupted."

*See Health Call of Detroit v Atrium Home & Health Care Services, Inc.,* 268 Mich. App.

83, 90 (2005).  A plaintiff must additionally prove either "the intentional doing of a per se

wrongful act or the intentional doing of a lawful act with malice and unjustified in law for

the purpose of invading plaintiff's contractual rights or business relationship."  *Feldman*

*v Green,* 138 Mich. App. 360, 369 (1984).  "A wrongful act per se is an act that is

inherently wrongful or an act that can never be justified under any circumstances."

*Prysak v R.L. Polk Co.,* 193 Mich. App. 1, 12-13 (1992).  "To establish that a lawful act

was done with malice and without justification, the plaintiff must demonstrate, with

specificity, affirmative acts by the defendant that corroborate the improper motive of the

interference."  *Mino v Clio School District,* 255 Mich. App. 60, 78 (2003).  "Where the

defendant's actions were motivated by legitimate business reasons, its actions would

not constitute improper motive or interference." *Id.*

PTS asserts that it had an expectancy that it would continue to supply tools to DCX, inasmuch as it was the top DCX supplier in 2003 and 2004 and it could have submitted a competitive national bid. But, PTS says Cooper interfered with that expectancy by inducing it to refrain from submitting a national bid and engaging in bid rigging. PTS, however, failed to present evidence that Cooper either induced it to refrain from submitting a national bid or engaged in bid rigging. Defendant's motion on Count V is granted.

### iii. Equitable Claims

#### a. Unjust Enrichment

The parties do not address whether Michigan or South Carolina law applies to PTS' unjust enrichment claim. But, the standard is virtually identical in both states. "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Estate of McCallum*, 153 Mich. App. 328, 335 (1986). *See also Sauner v Public Service Authority of South Carolina*, 354 S.C. 397, 409 (2003). Courts, however, should be cautious in imposing a "contract in law" in order to prevent unjust enrichment. *McCallum*, 153 Mich. App. at 335 . The essential elements of such a claim are receipt of a benefit by the defendant from the plaintiff which would be inequitable for the defendant to retain. *McCallum*, 153 Mich. App. at 335. *See also Sauner*, 354 S.C. at 409.

PTS says it performed services for Cooper which were not contemplated by the distribution agreement and sometimes was contrary to PTS' interest, including: 1) promoting tools for Cooper at the Warren Tech Center and working at DCX plants

21

(formerly serviced by Kramer) even though its efforts would result in sales to other distributors outside PTS' region, and 2) accepting Kramer as a customer (after it was terminated as a distributor) and waiving the right to, instead, compete against Kramer.

PTS says the benefit to Cooper for these acts was the retention of DCX business and that there is a question of fact regarding the value of the uncompensated services PTS performed. PTS further asserts that the Court should imply a contract based upon the benefit Cooper received by causing PTS to waive its right to bid on the DCX contract. The benefit, says PTS, was the savings Cooper obtained through its settlement of the Kramer litigation.

"The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution." *McCallum*, 153 Mich. App. at 335. A person who received a benefit from another will only be liable if "the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." *Id.* PTS fails to indicate why it would be "unjust" for Cooper to retain the benefit of its efforts since PTS admits it derived tangible benefits as well. McClure testified that PTS benefitted from its promotion and work when it persuaded an out-of-region DCX plant to include a tool in its system, because plants within PTS' region then would have access to those tools and PTS "could sell more product to their plants in Michigan." Pl. Exh. CC at pp. 84-87. And, PTS acknowledges that it was handsomely paid during the years it accepted Kramer as a customer. Defendant's motion on Count VI is granted.

### b.     Breach of Fiduciary Duty

PTS acknowledges that its manufacturer-distributor relationship with Cooper, without more, does not give rise to a fiduciary duty. But, citing *Boden v Renihan*, 299

Mich. 226, 239 (1941), PTS asserts that such a duty arises when there is an "intimate personal or business relationship" in which trust or confidence is accepted. PTS says Cooper changed their relationship when it promised to protect PTS by submitting a national bid on the DCX contract. By doing so, PTS says Cooper acted as an advisor on how PTS should conduct its business and, therefore, PTS "had a foundation to believe that Cooper was acting in [PTS'] interest." Pl. br. at p. 41. (For this proposition, PTS relies upon South Carolina law, *Burwell v South Carolina National Bank*, 288 S.C. 34 (1985). Cooper also argues the claim under Michigan and South Carolina law.) Cooper disputes PTS' characterization of what it was told about Cooper's intentions and expectations.

It is not necessary for the Court to reach the question of whether Cooper's actions created a fiduciary relationship (or decide which state law applies) because PTS again failed to establish a factual basis for its claim. That is, even if it is presumed that Cooper's promise (via Sheehan) created a fiduciary relationship, PTS has not proven that Cooper breached its fiduciary duty; Cooper submitted a national bid as promised, and there is no evidence Cooper engaged in deliberate sabotage contrary to PTS' interests. Defendant's motion on Count VII is granted.

### c. Promissory Estoppel

The parties do not address whether Michigan or South Carolina law applies, but the proofs required for a claim of promissory estoppel are virtually the same under both.

"Promissory estoppel arises in equity when (1) there is a promise (2) that the promisor should have reasonably expected to induce action of a definite and substantial character on the part of the promisee (3) which in fact produces reliance or forbearance

of that nature (4) under circumstances such that the promise must be enforced if injustice is to be avoided." *Barber v SMH (US), Inc.*, 202 Mich. App. 366, 375-376 (1993). *See also Powers Construction Co., Inc. v Salem Carpets, Inc.*, 283 S.C. 302, 306 (1984). "In order to support a claim of estoppel, a promise must be definite and clear." *Id* at 376.

Citing no authority, PTS says Cooper had an obligation to "protect PTS' exclusive dealings with [DCX]" in exchange for PTS not bidding on the national contract, and that Cooper should be bound by that promise. Pl. br. at pp. 41-42. PTS' assertion is an apparent reference to Cooper's promise to protect distributor's territories by submitting a national bid and PTS' contention that Cooper instead engaged in bid rigging which actually harmed PTS' interests. But, as stated, there is no evidence of bid rigging and, consequently, no evidence Cooper reneged on a "promise" of protection. Defendant's motion is granted on Count VIII.

### B.   MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COUNTERCLAIM IN REPLY

In its Counterclaim in Reply, PTS alleges that Cooper's termination of the Distributorship and APEX Agreements constitutes breach of contract (Count I) and breach of fiduciary duty (Count III). Cooper contends summary judgment is warranted on both claims.

### i.   Breach of Contract

Under choice of law provisions in each contract, the Distributor Agreement is governed by South Carolina state law and the APEX Agreement is governed by Ohio state law. Both were terminable by either party without cause with either 30 days

24

(Distributor) or 6 months (APEX) notice.

Under Ohio law, "a distributorship agreement with no express provision as to duration is generally terminable at will by either party after a reasonable duration and on reasonable notice." *Miller v Wikel Manufacturing Co., Inc.*, 46 Ohio St.3d 76, 78 (1989). South Carolina law, likewise, provides that "[w]here [a] contract is terminable at will, reasonable notice from either party is all that is required to terminate the agreement." *Carolina Cable Network v Alert Cable TV, Inc.,* 316 S.C. 98, 102-103 (1994). There appears to be a conflict, however, in South Carolina regarding the standard for wrongful termination of a contract. At least one court said a contract, even if terminable at will, will not be enforced if it was terminated contrary to "equity and good conscience." *Philadelphia Storage Battery Co. v Mutual Tire Stores*, 161 S.C. 487 (S.C. App. 1931). Notwithstanding *Philadelphia Storage*, later courts have said that "no South Carolina decision recognizes a cause of action in tort for termination of a contractual relation in a manner contrary to equity and good conscience." *Bessinger v BI-LO, Inc.*, 366 S.C. 426, 434 (2005); *Love v Gamble*, 316 S.C. 203, 212 (1994). Rather, a claim of wrongful termination will only lie under extraordinary circumstances. *Carolina Cable,* 316 S.C. at 103. "The extraordinary circumstances which must be demonstrated are those which support a finding that the termination was done arbitrarily, maliciously or in bad faith." *Id* at 104.

PTS failed to raise a genuine issue of material fact under Ohio law or either standard of South Carolina law. It is undisputed that Cooper gave PTS timely notice of the terminations. And, PTS bases its claim that the contracts were terminated contrary to "equity and good conscience," or arbitrarily, maliciously or in bad faith solely on

allegations already found to lack evidentiary support--that Cooper made false promises to facilitate bid rigging. Cooper's motion is granted on this claim.

### ii. Breach of Fiduciary Duty

PTS asserts its breach of fiduciary duty claim with respect to Cooper's termination of the Distributorship and APEX agreements on the same factual basis asserted for its breach of fiduciary duty claim in PTS' Fourth Amended Complaint. Cooper's motion is granted for reasons already stated.

### C. MOTION FOR SUMMARY JUDGMENT ON COOPER'S COUNTERCLAIM

Cooper brings a claim of breach of contract against PTS in Count I of its Counterclaim based on PTS' outstanding invoices in the amount of $412,145.41 for products received. Cooper further alleges that PTS owes an additional $32,810.82 in monthly service charges, pursuant to a provision in the Distributorship Agreement which states that "[a] service charge of 1.5% per month will be applied to the invoiced price the first of each month, for all invoices which are unpaid within the standard terms." Def. Exh. 3, Terms and Conditions, ¶3(b). The standard terms of purchase are "net 30 days." Id. at ¶3(a).

Lastly, Cooper requests prejudgment interest from the day before the Counterclaim was filed, October 18, 2006, through the date of judgment. South Carolina permits an award of prejudgment interest on obligations to pay money from the time the payment comes due, if the amount owed is certain. *See Butler Contracting, Inc. v Court Street, LLC*, 369 S.C. 121, 133 (2006). South Carolina also sets the interest rate at 8 and 3/4 percent per annum if there is no written agreement setting a

different rate. *See Id*; S.C. Code Ann. §34-31-20(A). The parties are free, however, to agree upon a higher rate of interest within legal limits. *Butler Contracting*, 369 S.C. at 133. Cooper contends that the provision in the Distributorship Agreement which allows for a 1.5 percent service charge equates to a prejudgment interest rate of 18 percent per annum.

PTS stipulates that it owes the amount Cooper claims for unpaid invoices. However, it seeks a setoff for alleged damages Cooper owes on PTS' breach of contract claim. PTS also says Cooper waived any claim for a service charge on the unpaid invoices, because it never billed or collected a service charge during their 17 year relationship. And, without offering any analysis or authority, PTS says there is a question of fact regarding whether Cooper is entitled to prejudgment interest at a rate higher than allowed under South Carolina law.

PTS is not entitled to a setoff; its breach of contract claim fails on summary judgment.

There is no merit to PTS' claim that Cooper waived its right to enforce the service charge provision in the Distributorship agreement through its course of dealing. PTS failed to present cognizable evidence that Cooper, in fact, did not enforce the service charge provision. PTS' reliance upon the affidavit of Paul Horton, who was responsible for payments to Cooper, is insufficient because he only conclusorily says Cooper never charged a service charge, and that it was his "understanding" that Cooper and PTS agreed that no service charges or interest had to be paid on invoices. Pl. Exh. CT. However, Horton does not explain the basis of his "understanding," and, without context, his claim that Cooper never charged interest has no meaning. That is, the

service charge only applied to invoices not paid within 30 days.  Without some evidence of how often PTS carried a balance past 30 days and was not billed a service charge, it is impossible to assess whether there was a course of dealing which demonstrates waiver of that provision.  PTS says in its brief it "was most likely late on virtually every invoice that Cooper sent" over the course of their 17 year relationship.  Pl. br. at p. 5.  But, Horton does not make that assertion in his affidavit and PTS does not present other evidence to support the claim.  An affidavit which contains a recitation of conclusory allegations without any factual detail is insufficient to create a genuine issue of material fact.  *Leahy v Trans Jones, Inc.,* 996 F.2d 136, 139 (6th Cir.1993); *Hollowell v Michigan Consolidated Gas Co.*, 18 Fed. Appx. 332, 338 (6th Cir. 2001)(unpub. op.).

PTS also failed to present evidence or argument to refute Cooper's claim for prejudgment interest at the rate agreed upon in the Distributorship Agreement--18 per cent per annum.  But, it appears from the authority Cooper cites that it is not entitled, as it implies, to collect both a service charge and a duplicate amount as prejudgment interest.  In *Burnett Dubose Company, Inc. v Starnes*, 284 S.C. 196 (1984), the petitioner filed suit to collect an amount owed on account and a 1.5% per month (18% per annum) "service charge" on past due accounts.  Defendant's obligation to pay the service charge was stated in the invoice he signed.  Yet, the trial court found there was no written agreement for interest on past due accounts above the statutory amount allowed under S.C. Code Ann. 34-31-20.  The Court of Appeals reversed, stating that the invoice was a written agreement which allowed the petitioner to collect the higher rate of interest.

*Burnett* is instructive; the petitioner only received one award of interest based

28

upon the rate agreed upon as a service charge. There is no apparent basis to allow Cooper to collect both a service charge and prejudgment interest.

Cooper's motion for summary judgment on Count I is granted, and the Court finds Cooper is entitled to judgment in the amount of $412,145.41 for unpaid invoices and prejudgment interest at a rate of 18% per annum from the day before the Counterclaim was filed, October 18, 2006, through the date of judgment. Counts II and III are moot.

## V. CONCLUSION

Defendant's Motion for Summary Judgment on Plaintiff's Fourth Amended Complaint and Motion for Summary Judgment on Plaintiff's Counterclaim in Reply are **GRANTED** in their entirety. Defendant's Motion for Summary Judgment on Count I of Cooper's Counterclaim is **GRANTED,** and Counts II and III are deemed **MOOT**. Judgment enters in Cooper's favor and against PTS in the amount of $412,145.41, plus prejudgment interest at a rate of 18% per annum from October 18, 2006 through the date of entry of the judgment.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: February 29, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 29, 2008.

s/Linda Vertriest
Deputy Clerk